# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA ex rel.
LORI L. THEMMES and ALMA THOMMA,

        Plaintiffs,

        v.                             Case No. 04-C-700

HAMILTON ENTERPRISES, INC. d/b/a
QUINTRON INSTRUMENT COMPANY,

        Defendant.

---

## DECISION AND ORDER ON MOTION TO DISMISS

---

### I. BACKGROUND

Lori L. Themmes ("Themmes") and Alma Thomma ("Thomma") brought this *qui tam* action on behalf of the United States alleging that the defendant, Hamilton Enterprises, Inc. ("Hamilton"), violated the False Claims Act, 31 U.S.C. § 3729 et seq. The United States has notified the court of its election not to intervene, and therefore Themmes and Thomma ("the relators") are authorized to conduct this action. 31 U.S.C. § 3730(b)(4)(B). Before Hamilton was served with the original complaint containing the false claims cause of action, the relators filed an amended complaint adding two additional causes of action. The first additional cause of action alleges that Themmes was fired from her job at Quintron Instrument Company ("Quintron") because of her actions in furtherance of a False Claims Act enforcement action. The second additional cause of action alleges that Themmes was wrongfully discharged in violation of Wisconsin law.

The defendant thereafter filed a motion to dismiss. The motion to dismiss alleges that the amended complaint fails to state a claim upon which relief can be granted and should therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). The defendant also alleges that the amended complaint should be dismissed because it lacks the particularity required by Fed. R. Civ. P. 9(b). The defendant's motion is now fully briefed and ready for decision.

Factual Pleadings

The following factual allegations are taken directly from the plaintiffs' amended complaint and are accepted as true for the purpose of this motion to dismiss. *Ameritech Corp. v. McCann*, 297 F.3d 582, 585 (7th Cir. 2002).

Quintron is an unincorporated company owned by Hamilton Enterprises and is in the business of manufacturing diagnostic breath-testing machines called MicroLyzers. MicroLyzers are instruments used by health care providers to detect the level of hydrogen and/or methane in the breath of patients suffering from digestive disturbances. (Compl. at ¶ 7.)

Themmes was employed by Quintron in the position of "Electronics Manager" from August 13, 2001 to July 14, 2003. (Compl. at ¶ 3.) Thomma was employed at Quintron through a temporary employment service as an administrative assistant from July 1, 2003 through January 13, 2004. (Compl. at ¶ 4.)

Since at least 1999, Quintron manufactured MycroLyzers with used parts and sold them as "new" to Veterans Administration hospitals ("VA hospitals") and other United States agencies and government funded institutions. These sales included a sale to the VA hospital located in San Francisco in 2003. (Compl. at ¶ 8.)

2

Quintron also recycled used parts into machines that were held out as "upgraded" with new and improved components, and into machines that were returned for repairs. (Compl. at ¶¶ 9-10.)

Since at least 1999, Quintron manufactured its most expensive MicroLyzer, the SC model, with recycled "math blocks." The math block is the electronic "brain" of a MycroLyzer which reads a patient's breath sample. (Compl. at ¶ 11.) Between late 1999 and approximately October 2001, recycled math blocks were also used in the DP model MycroLyzer. (Compl. at ¶ 4.) "Upon information and belief" Quintron also manufactured its 12i model MicroLyzer with recycled math blocks. (Compl. at ¶ 13.)

Quintron also recycled used "display chips," the part of the MycroLyzer which displays the machine's results, in MycroLyzers sold as "new," returned for upgrading, and returned for repairs. This included recycling used display chips in all four of the MycroLyzers which Quintron manufactures. (Compl. at ¶¶ 15-16.)

MicroLyzers also have a part called a "thumb-wheel switch" which is used to calibrate the machine. In a phone conversation in late June 2003, Steve Hamilton, Quintron's president, ordered Themmes to use up the used thumb-wheel switches currently in storage. Themmes refused. (Compl. at ¶¶ 18-19.)

"Upon information and belief," Quintron continues to recycle used math blocks, display chips, and thumb-wheel switches into machines sold as "new," returned for upgrading, and returned for repair. (Compl. at ¶ 23.)

In February of 2003, Themmes confronted Steve Hamilton about the company's practice of manufacturing MicroLyzers with used math blocks and selling them as "new," and also about the fact

3

that customers had returned machines for repairs involving the math blocks. Steve Hamilton responded: "We'll use them until we use them up." (Compl. at ¶ 14.)

In February 2003, Themmes confronted Steve Hamilton about Quintron's practice of recycling display chips. Steve Hamilton responded: "Well, we've always done that." (Compl. at ¶ 17.)

The day after Themmes was ordered by Steve Hamilton to use up the used thumb-wheel switches, Themmes confronted Lyle Hamilton, the founder and CEO of Quintron, about Steve Hamilton's order. Lyle Hamilton agreed that doing so was highly unethical and illegal and said he would talk to Steve Hamilton upon his (Steve's) return to the office. (Compl. at ¶ 20.)

On or about June 26, 2003, Steve Hamilton gave Themmes a reprimand letter on the pretext that Themmes had complained about her hours of work. Themmes then responded in a written letter dated July 9, 2003 as follows:

> I have brought this to everyone's attention in the past, however for the overall sake of the product I am going to say it again. Serious quality issues exist here and need to be addressed. It is not fair to the employee who has to build the product, or to the customer who uses it. In my case I am forced to rework instruments for reasons I should not have to rework them. I have spoke[n] repeatedly to my technical manager, quality manager, yourself and last week with Lyle. Used parts do not belong in new machines.

(Compl. at ¶ 21.)

On or about July 14, 2003, Themmes' employment at Quintron was terminated. (Compl. at ¶ 22.)

## II. LEGAL STANDARDS

In evaluating whether a plaintiff's complaint fails to state a claim, a court must take the plaintiff's factual allegations as true and draw all reasonable inferences in his favor. *Brown v. Budz*,

4

398 F.3d 904, 908 (7th Cir. 2005). In making such evaluation, however, the court generally should consider only the allegations of the complaint. *Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir. 2005). "Dismissal is proper under Rule 12(b)(6) only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id*. (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). "Indeed, if it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." *Brown*, 398 F.3d at 909 (internal quotations omitted).

"Whether a complaint sufficiently states a claim turns on whether it meets the general rules of pleading a claim for relief. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain 'a short and plain statement of the claim showing the pleader is entitled to relief.' This 'short and plain statement' requires a plaintiff to allege no more than 'the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer.'" *Id*. at 908.

However, Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Claims made under the False Claims Act must be stated with the particularity required by Rule 9(b). *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003).

### III.  DISCUSSION

#### A.  False Claims

Tracking the language of the False Claims Act, the plaintiffs' first cause of action alleges that the defendant "knowingly submitted false or fraudulent claims for payment, or caused false or fraudulent claims for payment to be submitted, to officials of the United States government" and "knowingly made or used, or caused to be made or used, false records or statement to get false or

5

fraudulent claims paid or approved by the officials of the United States government," in violation of 31 U.S.C. § 3729(a)(1) and (2). (Compl. at ¶¶ 26-27.) The defendant argues that this false claim cause of action should be dismissed both because it fails to state a claim on which relief can be granted and because it is not pleaded with the particularity required by Rule 9(b).

Rule 12(b)(6)

The first argument the court will address is the defendant's contention that the plaintiffs' false claims cause of action should be dismissed based on Rule 12(b)(6) alone, independent of any requirements imposed by Rule 9(b). (Def.'s Mem. at 10.) The pertinent portion of the False Claims Act establishes liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

31 U.S.C. § 3729(a). The plaintiffs' false claims cause of action is based on the factual allegation that the defendant "manufactured MycroLyzers with used parts and sold these highly sensitive instruments to Veterans Administration hospitals . . . and other United States agencies and government-funded institutions as 'new.'" (Compl. at ¶ 8.)

The first reason the defendant gives for why the plaintiffs have failed to state a claim upon which relief can be granted is, essentially, that the claim the plaintiffs do set forth is not like other claims that have been recognized under the False Claims Act. The defendant argues that, commonly, False Claims Act actions are based on the government being overcharged, a contract term,

6

specification, or statute being violated, or a false certification being provided to the government. The defendant maintains that the plaintiffs here are not alleging such conduct. (Def.'s Mem. at 11.) However, in the court's opinion, the plaintiffs have pleaded facts that imply that a contract term may have been violated. The plaintiffs allege that a MycroLyzer was "sold" to a VA hospital as "new." Drawing all reasonable inferences in the plaintiffs' favor, as I am required to do at this point, it can be inferred that the alleged "sale" involved an agreement to purchase, followed by delivery and payment. The amended complaint specifies a "new" MicroLyzer, so it is reasonable to infer that the delivery of a MycroLyzer with used parts may have constituted a breach of the agreement. Therefore, it is not correct to say that the plaintiffs' allegations are entirely different from other conduct previously recognized to support a claim under the False Claims Act.

Furthermore, while the various types of conduct mentioned by the defendant may constitute violations of the False Claims Act, the list is not exclusive. In analyzing an earlier version of the False Claims Act, the Supreme Court concluded that the Act was originally "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). The Court went on to state that "[i]n the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil." *Id*. With this in mind, the court finds that the False Claims Act does apply to a situation where someone knowingly represents that they are selling the government one thing, demands and receives payment for it, and then knowingly delivers something else. Such conduct fits into the statutory language of "present[ing] . . . a false or fraudulent claim

7

for payment or approval." Drawing the reasonable inferences from the plaintiffs' pleadings that must be drawn, I am compelled to conclude that that is precisely what the plaintiffs have alleged.

The defendant next argues that the plaintiff in a false claims action must plead that the allegedly false statements at issue were material to the government's decision to buy. (Def.'s Mem. at 13.) "Materiality" of some sort is an element of a false claims cause of action. *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir. 1999). However, there is no reason to believe that materiality must be pleaded differently than any other element of the cause of action. Here, the plaintiffs allege that the defendant sold a MycroLyzer with used parts as "new." Again, it is reasonable to infer that the existence of used parts in a new machine would be material to the purchaser. That is all that is required at the pleading stage.

Simply stated, while the amended complaint may not go into great detail, "it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief." The court therefore finds that the plaintiffs have stated a false claims cause of action under the False Claims Act, and the defendant's motion to dismiss, to the extent it is based on Rule 12(b)(6), will therefore be denied.

Having thus found, it becomes unnecessary, at least at this point, to analyze the alternative possibility that the defendant somehow made an "implied certification" of compliance with certain regulations, with which it was not in compliance and on which payment was conditioned, and in that way presented a "false or fraudulent claim." *See e.g. Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531-32 (10th Cir. 2000); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000).

8

Rule 9(b)

The next question to be addressed is whether the amended complaint satisfies the requirements of Rule 9(b). The Seventh Circuit Court of Appeals has not dealt extensively with the requirements of Rule 9(b) in a False Claims Act context. In *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374 (7th Cir. 2003), the court applied Rule 9(b) to an action under the False Claims Act, but ultimately upheld the district court's dismissal of the complaint after a discussion focused more on Federal Rule of Civil Procedure 8 than on Rule 9. *Id.* at 377-79. As a result, the court did not conduct a detailed discussion of the requirements of Rule 9(b).

The lack of Seventh Circuit cases applying Rule 9(b) to False Claims Act actions has led the defendant in this case to cite cases from other circuits on the question of what Rule 9(b) requires in this particular context. For example, the defendant cites *United States ex rel. Calusen v. Lab. Corp. of Am.*, 290 F.3d 1301 (11th Cir. 2002), which establishes a framework with which to assess compliance with Rule 9(b). This, in turn, leads the plaintiffs to argue that the out-of-circuit cases cited by the defendant are not useful, and has led the United States to file an Amicus brief arguing for a particular interpretation of *Calusen*.

This court finds it unnecessary to enter into an extensive analysis of *Clausen* or other cases from outside the Seventh Circuit in order to answer the question at hand. Rule 9(b) applies to all cases involving "averments of fraud or mistake." The Seventh Circuit has had plenty of opportunity to discuss the requirements of Rule 9(b) in the context of other actions containing allegations of fraud. The parties have not provided any reason, and this court can see none, why the rule would be applied differently in cases arising under the False Claims Act as opposed to other cases involving

9

allegations of fraud. The court will therefore proceed to the requirements of Rule 9(b) as they have been interpreted by the Seventh Circuit.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The purposes of the rule are to (1) protect the defendant's reputation from harm; (2) minimize "strike suits" and "fishing expeditions"; and (3) provide notice of the claim to the adverse party. *Viacom Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). Federal Rule of Civil Procedure 8, which requires a "short and plain statement of the claim," must be read together with Rule 9(b). *Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir. 1975). The two rules are not in conflict as "it is possible to write a short statement narrating the claim -- which is to say, the basic grievance -- even if Rule 9(b) requires supplemental particulars." *Garst*, 328 F.3d at 376. Even so, Rule 9(b) is not to be interpreted as requiring "full-scale fact pleading in a fraud case." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992).

Although full fact-pleading is not required, the plaintiff must state the "circumstances constituting the fraud." Fed. R. Civ. P. 9(b). Where the fraud involved is misrepresentation, this means that the plaintiff is required to "state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Viacom*, 20 F.3d at 777; *Bankers Trust,* 959 F.2d at 683. Moreover, "the duty to plead the circumstances constituting fraud with particularity [can] not be fulfilled by pleading those circumstances on 'information and belief' unless they [are] facts inaccessible to the plaintiff, in which event he [has] to plead the grounds for his suspicions." *Bankers Trust,* 959 F.2d at 684.

10

Moreover, "the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim." *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998); *see also Uni\*Quaility, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). This is particularly so when the plaintiff is alleging fraud against a third party. *Id*.

In the context of 31 U.S.C. § 3729(a)(1) and (2), the "circumstances constituting the fraud" means the circumstances which constitute the presentation of a "false or fraudulent claim for payment or approval" to the government, or the use of a "false record or statement" to get such a claim paid or approved by the government.

The complaint presents a modestly detailed account of how Quintron manufactured, upgraded, and repaired MicroLyzers with used parts. This alone, of course, is not a violation of the False Claims Act. The plaintiffs' false claims cause of action is predicated on the allegation that the defendant sold MycroLyzers containing used parts to VA hospitals and other government funded institutions as "new." The only factual allegations in the complaint that relate in any way to any interaction with the government are found in paragraph 8. That paragraph states in whole:

> Since at least 1999, QuinTron manufactured MycroLyzers with used parts and sold these highly sensitive instruments to Veterans Administration hospitals ("VA") and other United States agencies and government-funded institutions as "new", including but not limited to, on information and belief, a sale to the VA in San Francisco, California in 2003. QuinTron's business records list the VA as a customer.

At the outset, the court notes that the allegation that a MycroLyzer was sold to a VA hospital is made "on information and belief." As noted previously, such allegations are only allowable if the facts involved are inaccessible to the plaintiff, and in the case that they are, the plaintiff is required to plead the grounds for his suspicions. *Bankers Trust,* 959 F.2d at 684. I believe the plaintiffs have

satisfied these requirements. The relators are both former employees of Quintron, and as such would not have access to sales records. The relators indicate the grounds for their suspicion that the defendant sold a MycroLyzer with used parts to the VA hospital in San Francisco to be that the VA hospital is listed in Quintron's business records as a customer. The combination of the relators' knowledge of the manufacturing process at Quintron, their knowledge of the products Quintron sells, and the VA hospital's being listed as a "customer," is enough to allow the simple allegation that the VA hospital was sold a MycroLyzer to be made "on information and belief."

That being said, it is necessary to examine the allegations of the complaint in order to see if the "circumstances" of the alleged fraud are adequately pleaded. The first "circumstance" which must be pleaded is the "identity of the person who made the misrepresentation." *Viacom*, 20 F.3d at 777. Here, that would be the person who either presented a false or fraudulent claim for payment to the government or used a false record or statement to get such a claim paid or approved. The complaint is silent on this issue. The plaintiffs argue that the "who" of the fraudulent scheme is properly set forth by identifying Steve Hamilton as the Quintron employee who directed others to build the machines with used parts. (Pls.' Br. at 5.) However, building machines with used parts, in and of itself, has nothing to do with fraud. It is only when those machines are represented to be "new" that fraud is potentially implicated. Simply stated, the complaint contains no allegation as to who dealt with the government, be it by selling an item to the government, billing the government for an item, entering into a contract with the government, or interacting with the government in any other way.

The next set of *Viacom* "circumstances" that must be pleaded is the time, place, and content of the allegedly false claim for payment. As to the time, the complaint indicates the time periods to

be "since at least 1999" and "in 2003." Without deciding whether exact dates are required, I believe it is clear that pointing to dates in terms of whole years is not stating the circumstances of the fraud "with particularity" as Rule 9(b) requires. Next, assuming that there is only one VA hospital in San Francisco, the complaint's reference to "a sale to the VA in San Francisco, California" does state a place with particularity. But as to the content of the allegedly false claims or records, the complaint is again silent. Did a sales person visit the VA hospital in San Francisco and solicit the purchase of new MycroLyzers? Was an invoice sent to the hospital which was simply understood to be for a new MycroLyzer? The court (and the defendant) is left to conjecture. Similarly, the complaint also fails to set forth any allegations regarding the last *Viacom* "circumstance," i.e., the method of the fraudulent communication.

It seems that the scenario that the plaintiffs are suggesting occurred is fairly straight forward: the VA hospital ordered a new MycroLyzer from the defendant based on some print material describing the product or communication with the defendant; the VA hospital was sent a machine manufactured with used parts; and the defendant sent a bill which was understood by the VA hospital to be for a "new" MycroLyzer. But while it might be easy enough for the court to construct such a scenario, Rule 9(b) requires that the complaint contain factual allegations regarding the alleged fraud. The complaint in this case does not contain the required allegations.

This does not end the inquiry, however, because it may be that the plaintiffs are entitled to a relaxation of Rule 9(b)'s requirements due to certain information being outside of their control. As former employees, the relators do not have access to information regarding particular dates of sales, who might have sent invoices at given times, or the exact content of company communications. Furthermore, although the government is a named party in this action, in reality the relators are

Case 2:04-cv-00700-WEC   Filed 05/26/05   Page 13 of 24   Document 25

alleging that fraud was committed against a third party, to wit, VA hospitals and other government funded agencies. It is therefore likely that this action qualifies for relaxed treatment under Rule 9(b). *See Corley*, 142 F.3d at 1051; *Uni\*Quaility*, 974 F.2d 918 at 923.

The problem, however, is that the plaintiffs have not pleaded any particulars relating to the allegedly fraudulent conduct. As stated earlier, manufacturing machines with used parts is not fraudulent. It is only when those machines are represented as "new" that the question of fraud is potentially implicated. But the plaintiffs have not pleaded any facts whatsoever regarding the allegation that the product was represented to be "new." The complaint simply states that the defendants sold MycroLyzers as "new." While a plaintiff who lacks access to information might be excused for failing to plead certain specific details, this does not mean that Rule 9(b) is done away with altogether. There still must be some factual allegations regarding the alleged fraud. *See Corley*, 142 F.3d at 1051 (excusing lack of allegations as to the specific time, place, and identity of the person who some misrepresentations were made to, in RICO case where other similar and related misrepresentations were plead with requisite particularity); *Yannacopolous v. General Dynamics*, 315 F. Supp. 2d 939, 944-46 (N.D. Ill. 2004) (excusing the lack of some specific dates and places where the complaint contained many other specifics regarding the allegedly fraudulent claims). Here, the plaintiffs have not alleged with particularity any of the circumstances of the alleged fraud.

Because of the plaintiffs' failure to allege any particulars regarding the alleged fraud, the court concludes that, even under a "relaxed" standard, the plaintiffs have not pleaded a violation of the False Claims Act with the particularity required by Rule 9(b). The plaintiffs' false claims cause of action will therefore be dismissed. However, the plaintiffs will be granted twenty (20) days from

14

the date of this order by which to file a second amended complaint correcting (if they can) the deficiencies of their first amended complaint.

## B. Retaliatory Discharge

The plaintiffs' second cause of action alleges that Themmes was terminated from her employment at Quintron at least in part because she took actions in furtherance of a False Claims Act enforcement action. The "whistle-blower" provision of the False Claims Act provides in pertinent part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). In order to establish a violation of § 3730(h), Themmes is required to show that (1) her actions were taken "in furtherance of" a False Claims Act enforcement action and were therefore protected by the statute; (2) her employer had knowledge that she was engaged in this protected conduct; and (3) her discharge was motivated, at least in part, by the protected conduct. *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004).

The defendant first argues that Themmes' retaliatory discharge cause of action should be dismissed because it fails to allege that Themmes engaged in conduct that is protected by the False Claims Act.

"An employee need not have actual knowledge of the FCA for her actions to be considered 'protected activity' under § 3730(h)." *Fanslow,* 384 F.3d at 479. However, "an employee must show that an FCA action is a 'distinct possibility' at the time of the investigation for her actions to be

15

considered 'protected activity.'" *Id.* In order to assimilate the rule that an employee need not be personally aware of the False Claims Act, and the rule that an action under the False Claims Act must be a "distinct possibility," the Seventh Circuit has adopted the following standard: "the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Id.* at 480.

If, however, an employee's actions are not "in furtherance of" an enforcement action, but are done for another reason, encouraging the employer to comply with federal regulations, for example, then the conduct is not "protected conduct." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 945 (7th Cir. 2002) (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F. 3d 731, 740 (D.C. Cir. 1998)); *see also Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997) ("Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that [the plaintiff] was acting 'in furtherance of' a *qui tam* action.").

As this is a motion to dismiss rather than a motion for summary judgment, the court must look to the allegations of the complaint, taking them to be true and drawing all reasonable inferences therefrom, and will dismiss the retaliatory discharge cause of action only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Examined in this light, the plaintiffs' allegations relating to the termination of Themmes' employment, and which the court takes as true, are as follows: (1) Themmes confronted Steve Hamilton in February 2003 about the use of used math blocks in "new" products; (2) at that time

16

Themmes also brought to Steve Hamilton's attention the fact that MycroLyzers had been returned to Quintron because they had math block problems; (3) Themmes confronted Steve Hamilton about the company's use of used display chips; (4) Steve Hamilton affirmed that Quintron had and would continue to use used parts in MycroLyzers; (5) Themmes refused to obey Steve Hamilton's order to install used thumb-wheel switches and went to Lyle Hamilton about that order; (6) Lyle Hamilton agreed that using used thumb-wheel switches was highly unethical and illegal; (7) Themmes was then issued a pretextual reprimand letter because of her complaints; (8) Themmes wrote a letter to management stating that "[s]erious quality issues exist" and that "[u]sed parts do not belong in new machines"; and (9) Themmes was soon after fired.

What is conspicuously missing are any allegations establishing that Themmes' actions were performed in furtherance of a False Claims Act enforcement action, or indeed, that Themmes was concerned in any way about fraud on the government. Themmes is not required to have had knowledge of the provision of the False Claims Act, but she must have, in good faith, believed that Quintron was committing fraud against the government. *Fanslow,* 384 F.3d at 480.

The whistle-blower provision of the False Claims Act is meant to protect employees who are retaliated against because they are taking actions related to perceived fraud on the government. The *Falslow* court adopted a test for determining what is "protected activity" based on the employee's reasonable belief that fraud was being perpetrated on the government, and not on whether the False Claims Act had actually been invoked by, or was known to, the employee. That test, however, was not meant to extend the whistle-blower provision's protection beyond employee activity related to or motivated by a concern that the employer was defrauding the government. Instead, it was formulated in terms of the employee's reasonable belief so as to ensure that not only those with

17

"sophisticated legal knowledge would be protected by the statute." *Fanslow,* 384 F.3d at 479. That is to say, employees who are investigating fraud on the government, or otherwise acting in furtherance of a reasonable suspicion that the government is being defrauded, are protected even if they do not objectively know about the False Claims Act and its provisions.

This court therefore reads the *Fanslow* test to be a substitute only for the existence of an actual False Claims Act enforcement action. The test does not do away with the requirement that, in order to be protected, the conduct must be "in furtherance of" something. If it is not "in furtherance of" a False Claims Act enforcement action (because the employee does not know that the Act exists), it must be "in furtherance of" the employee's reasonable suspicions of fraud on the government.

In the case at hand, even taking all of the plaintiffs' allegations as true and drawing all favorable inferences from those allegations, there is nothing in the complaint that would lead to the conclusion that Themmes' actions were at all related to, or motivated by, suspected fraud on the government. The court can "hypothesize a set of facts, consistent with the complaint," *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005), whereby it is shown that Themmes' actions were motivated by a legitimate concern for users of Quintron's products (patients with serious medical conditions), or by a belief that Quintron was acting unethically, or even breaking the law. However, the court cannot hypothesize any set of facts, consistent with the complaint, which would establish that Themmes' actions were motivated by or related to a belief that the government was being defrauded. Simply stated, nothing in the complaint alleges or suggests that Themmes was concerned or even aware that the government was possibly being defrauded at the time she engaged in the conduct for which she was allegedly fired.

18

Stated another way, nothing in the complaint suggests that Themmes' actions were "in furtherance of" a False Claims Act enforcement action or, assuming that Themmes was not aware of the False Claims Act, that they were based on a suspicion that Quintron was defrauding the government. As that is an essential element of a retaliatory discharge cause of action, the plaintiffs have failed to state a retaliatory discharge claim upon which relief can be granted.

Furthermore, the second element of a False Claims Act retaliation claim is that the employer must have had knowledge that the employee was engaged in protected conduct. *Fanslow*, 384 F.3d at 479. For all of the same reasons discussed previously, the court cannot hypothesize a set of facts, consistent with the complaint, which would support such a finding. Themmes allegedly had three verbal "confrontations" with Quintron management and wrote one letter regarding Quintron's use of used parts. The plaintiffs do not, however, allege that Themmes mentioned the government, VA hospitals, false billing, or anything else relating to fraud on the government in any of these communications.

In *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936 (7th Cir. 2002), the court considered a situation where an employee discovered that falsified bills were being submitted to Medicare for payment. The employee brought his findings to the company's shareholders and was soon after fired. *Id*. at 938. In *Brandon*, even though the employee used the words "illegal," "improper," and "fraudulent," when he confronted the shareholders about the billing, the court stated that "we cannot find that [the company] would have realized that it faced the 'distinct possibility' of [a *qui tam*] action." *Id*. at 944-45.

Although there are significant differences between *Brandon* and the case at hand (the procedural posture was different and the *Brandon* plaintiff's particular job duties included duties

19

which Themmes' job did not, and which were pertinent to the question of what notice the company had), the facts of that case highlight how far the plaintiffs in this case are from even alleging facts which could show that Quintron was aware that Themmes was engaged in "protected activity." In *Brandon*, even though the issue of falsified billing of the government was explicit and the plaintiff explicitly referred to such billing as "fraudulent," the court found that the company was not aware of the possibility of litigation. In the case at hand, the plaintiffs do not allege that Themmes or anyone else ever mentioned or even alluded to the government in any way, shape, or form, much less fraud on the government or possible litigation.

Even taking all of the allegations in the complaint as true and drawing reasonable inferences in their favor, the plaintiffs here could not hope to make a showing, even as strong as the failed showing in *Brandon*, for the proposition that Quintron knew that Themmes was engaged in "protected activity." Again, because such is an essential element of a retaliatory discharge cause of action, the plaintiffs have failed to state a retaliatory discharge claim on which relief can be granted.

As a result, and for all of the foregoing reasons, the plaintiffs retaliatory discharge cause of action will be dismissed. However, as with their false claims cause of action, the plaintiffs will be granted twenty (20) days from the date of this order by which to file a second amended complaint correcting (if they can) the deficiencies of their first amended complaint.

## C. Wrongful Discharge

The plaintiffs' third and final cause of action alleges that Themmes was fired in violation of Wisconsin law because she refused to comply with orders from Quintron management to violate fundamental and well defined public policies. The plaintiffs do not dispute that Themmes was an

20

at-will employee, but instead argue that she was fired in violation of a narrow exception to the general at-will employment doctrine recognized in Wisconsin. (Pls.' Br. at 18.)

In *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 573, 335 N.W.2d 834, 840 (Wis. 1983), the Wisconsin Supreme Court held that an at-will employee "has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law." The court elaborated on the public policy exception as follows:

> Given the vagueness of the concept of public policy, it is necessary that we be more precise about the contours of the public policy exception. A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute. . . .

> Courts should proceed cautiously when making public policy determinations. No employer should be subject to suit merely because a discharged employee's conduct was praiseworthy or because the public may have derived some benefit from it.

> A plaintiff-employee alleging a wrongful discharge has the burden of proving that the dismissal violates a clear mandate of public policy. Unless the employee can identify a specific declaration of public policy, no cause of action has been stated. The determination of whether the public policy asserted is a well-defined and fundamental one is an issue of law and is to be made by the trial court.

*Id*. at 573-74, 335 N.W.2d at 840-41.

In subsequent cases, the Wisconsin Supreme Court has maintained that "the public policy factors that give rise to an actionable claim under the exception remain very narrow." *Stronzinsky v. Sch. Dist. of Brown Deer*, 237 Wis. 2d 19, 42, 614 N.W.2d 443, 454 (Wis. 2000). A plaintiff seeking to invoke the public policy exception must "allege a clear expression of public policy" which is evidenced by an existing constitutional, statutory, or administrative provision. *Id*. The court then

Case 2:04-cv-00700-WEC   Filed 05/26/05   Page 21 of 24   Document 25

must "look to the content of the particular provision to determine whether it implicates a fundamental and well defined public policy." *Id.* at 42-43, 614 N.W.2d at 455. In short, in order for this court to address the plaintiffs' third cause of action, it would be necessary to interpret and apply Wisconsin law, including making determinations regarding public policy.

This court has jurisdiction in this matter pursuant to 28 U.S.C. § 1345 ("the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress"), and 28 U.S.C. § 1332 because the plaintiffs' retaliatory discharge cause of action is brought under the False Claims Act, a federal law.[1] The court's jurisdiction extends to the plaintiffs' wrongful discharge cause of action because that cause of action is "so related to the claims" in the False Claims Act causes of action that "they form part of the same case or controversy." 28 U.S.C. § 1367(a) (supplemental jurisdiction). The parties do not argue, and this court can find no basis, for jurisdiction over the wrongful discharge cause of action independent of the federal claims.

That this court has supplemental jurisdiction to consider the plaintiffs' wrongful discharge cause of action does not therefore mean that it must consider the merits of such cause of action. To the contrary, because it has determined that both of the plaintiffs' causes of action arising under federal law should be dismissed, it may decline to exercise jurisdiction over the supplemental state law cause of action. 28 U.S.C. § 1367(c)(3). In light of the state law issues involved and in accordance with its discretion to do so, this court will decline to exercise supplemental jurisdiction

---

[1] The United States is a party only to the false claims cause of action. Although not captioned as such, Themmes personally is the proper party to the retaliatory discharge and wrongful discharge causes of action. *See* 31 U.S.C. §3730(b), (c), and (h).

Case 2:04-cv-00700-WEC   Filed 05/26/05   Page 22 of 24   Document 25

over the plaintiffs' wrongful discharge cause of action if the plaintiffs fail to file a second amended complaint within twenty (20) days of the date of this order correcting the previously identified deficiencies of their amended complaint. As a result, the defendant's motion to dismiss the wrongful discharge cause of action for failure to state a claim upon which relief can be granted will be denied without prejudice.

NOW THEREFORE IT IS ORDERED that the defendant's motion to dismiss be and hereby is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss the plaintiffs' false claims cause of action, based on the grounds that it fails to state a claim upon which relief can be granted, be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss the plaintiffs' false claims cause of action, based on the grounds that it fails to comply with Fed. R. Civ. P. 9(b), be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss the plaintiffs' retaliatory discharge cause of action, based on the grounds that it fails to state a claim upon which relief can be granted, be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss the plaintiffs' wrongful discharge cause of action be and hereby is **DENIED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that the plaintiffs are granted leave to amend the amended complaint within twenty (20) days of the date of this order; if no second amended complaint is filed, this action will be dismissed.

23

**SO ORDERED** this <u>26th</u> day of May 2005, at Milwaukee, Wisconsin.


<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

Case 2:04-cv-00700-WEC   Filed 05/26/05   Page 24 of 24   Document 25